IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JAVON A. ROBINSON,

    Petitioner,

v.                                                                         Civil Action No. 3:08cv789

GENE JOHNSON,

    Respondent.

## MEMORANDUM OPINION

Petitioner Javon A. Robinson, a Virginia inmate proceeding *pro se*, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] Respondent filed a motion to dismiss and Rule 5 Answer (Docket Nos. 4, 5), providing Robinson with appropriate *Roseboro*[2] notice (Docket No. 7). Respondent claims that the statute of limitations bars this Petition.

Petitioner filed a motion for extension of time to respond to the motion to dismiss, which the Court granted. (Docket Nos. 10, 11.) Petitioner has responded. (Docket No. 12.) Jurisdiction is proper pursuant to 28 U.S.C. §§ 636(c) and 2254. The matter is ripe for adjudication. For the reasons stated below, the Petition must be dismissed.

---

[1] 28 U.S.C. § 2254(a) states in relevant part:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

[2] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

## I. Procedural History

Following a jury trial, the Circuit Court of the City of Richmond (the "Circuit Court") convicted Robinson of one count of first degree murder, one count of second degree murder, and two counts of use of a firearm in commission of those offenses. Two others, Darryl ("D.J.") Drummond and Kendric Lofton, participated in the crime, although they were tried separately. The Circuit Court sentenced Robinson to serve a total of thirty-eight years in prison. (Resp't Br. Supp. Mot. to Dismiss ("Resp't Br.") ¶ 1.) On October 13, 2006, the Supreme Court of Virginia refused Robinson's petition for appeal. (Resp't Br. ¶ 1.)

Robinson filed a petition for a writ of habeas corpus in the Supreme Court of Virginia on October 7, 2007. (Pet. 4.) (Docket No. 1.) The Supreme Court of Virginia denied Robinson's state habeas petition on April 3, 2008. (Pet'r Br. and Mem. of Law ("Pet'r Br.") Ex. C1.) (Docket No. 2.)

On December 1, 2008, Petitioner filed the present petition, raising the following claims:

Claim One: "Sixth Amendment right to confrontation violated by petitioner's defense counsel." (Pet. 6.)

Claim Two: "Fourteenth Amendment violation of right[s] to due process and equal protection." (Pet. 7.)

Claim Three: "Robinson invokes the ends of justice exception and avers that a fundamental miscarriage of justice has occurred in the matter of his trial and conviction for crimes he did not commit." (Pet'r Br. ¶ 5.)

Claim Four: The trial court erred by overruling Petitioner's two motions for a new trial based on the after-discovered evidence. (Pet'r Br. ¶ 15.)

Claim Five: Trial counsel was ineffective and had a conflict of interest when he did not act on his client's behalf to secure Drummond's testimony, in accordance with the affidavit, hostile or otherwise. (Pet'r Br. ¶ 17, 18.)

2

> Claim Five: Trial counsel was ineffective when he went against the wishes of his client by not securing Drummond's testimony. (Pet'r Br. ¶ 19.)

## II. Analysis

### A. Time Bar

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Section 101 of the AEDPA amended 28 U.S.C. § 2244 to require a one-year period of limitation for the filing of a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court. Specifically, 28 U.S.C. § 2244(d) reads:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

"Direct review" does not end when the final appellate court issues its mandate affirming the conviction, but instead when the time for filing a petition for certiorari expires. *Clay v. United States*, 537 U.S. 522, 524-525 (2003). Robinson's conviction became "final," as

3

§ 2244(d)(1)(A) defines the term, on January 11, 2007, the last day on which he could timely file a petition for certiorari with the Supreme Court of the United States.[3]

The limitations period ran from January 11, 2007, until Petitioner filed his state habeas petition. Under § 2244(d)(2), the limitations period tolled while Petitioner's state habeas petition was pending, but resumed once the Supreme Court of Virginia rejected the petition. *Harris v. Hutchinson*, 209 F.3d 325, 327 (4th Cir. 2000). Therefore, the period ran for 269 days prior to Petitioner's filing his state habeas petition on October 7, 2007. The limitations period tolled from October 7, 2007, until April 3, 2008, while Robinson's state habeas petition remained pending. The limitations period resumed after the Supreme Court denial on April 3, 2008, running another 252 days until Robinson filed the instant federal petition. Thus, a total of 521 days had accumulated. This 521 days clearly exceeds the one-year period of limitations. The statute of limitations bars this petition.

B. **Equitable Tolling**

Equitable tolling of the AEDPA's statute of limitations is "reserved for those rare instances where–due to circumstances external to the party's own conduct–it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Harris*, 209 F.3d at 330. "[T]o be entitled to equitable tolling, an otherwise time-barred petitioner must present '(1) extraordinary circumstances, (2) beyond his control or external to his own conduct, (3) that prevented him from filing on time.'" *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004) (*quoting Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (en banc)).

---

[3]*See* U.S. Sup. Ct. R. 13(1) (requiring petitions for certiorari to be filed within 90 days of the entry of judgment by a State court of last resort); *Lawrence v. Florida*, 549 U.S. 327, 333 (2007) (reaffirming the inclusion of time for seeking review by the Supreme Court when direct review of state criminal convictions become final under § 2244(d)).

4

"Principles of equitable tolling do not extend to garden variety claims of excusable neglect." *Rouse*, 339 F.3d at 246 (*citing Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990)).

Petitioner has not argued that his Petition is subject to equitable tolling, but does claim that a "fundamental miscarriage of justice" involving a conviction "for crimes he did not commit" has occurred. (Pet'r Br. ¶ 5.) In the context of overcoming an abuse-of-the-writ claim, the United States Court of Appeals for the Fourth Circuit has held that the "fundamental miscarriage of justice exception" permits review of otherwise procedurally barred claims only in those "'extraordinary instances' where the petitioner 'makes a proper showing of actual innocence.'" *Turner v. Jabe*, 58 F.3d 924, 931-32 (4th Cir. 1995) (citations omitted).

### C. Actual Innocence

Neither the Supreme Court nor the Fourth Circuit has decided whether a claim of actual innocence warrants tolling of the statute of limitations. Nevertheless, before addressing this difficult question, the Court should first consider whether Petitioner has made a sufficient showing of actual innocence. *Johnson v. Fla. Dep't of Corr.*, 513 F.3d 1328, 1333 (11th Cir. 2008). "Claims of actual innocence, whether presented as freestanding ones, *see Herrera v. Collins*, 506 U.S. 390, 417 (1993), or merely as gateways to excuse a procedural default, *see Schlup v. Delo*, 513 U.S. 298, 317 (1995), should not be granted casually." *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (additional parallel citations omitted). Here, the Court reviews Petitioner's claim under the more lenient standard for gateway claims set forth in *Schlup* because Petitioner's actual innocence claim would allow the Court to consider his otherwise time-barred constitutional claims. "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would

5

have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006) (*citing Schlup*, 513 U.S. at 327). The Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *Id.* at 538 (*quoting Schlup*, 513 U.S. at 327-28).

1. **Evidence at Trial**

In order to consider what effect the new evidence might have had on reasonable jurors, the Court must consider the evidence provided at trial. On February 17, 2005, police found Danielle Johnson and Ben Carter shot to death in Carter's apartment. (Trial Tr. vol. 1, 27-28, July 19, 2005.) The evidence showed that Ben Carter had eight gunshot wounds. (Trial Tr. vol. 2, 35-38, July 20, 2005.) Danielle Johnson died from a single gunshot wound to the back of the head. (Trial Tr. vol. 2, 42.) Numerous cartridge casings lay near the victims' bodies. (Trial Tr. vol. 1, 74-75.) Investigators found four .357 magnum bullets, including one recovered from Danielle Johnson's body and another recovered from Ben Carter's. (Trial Tr. vol. 1, 168.) A firearms expert concluded that the four bullets shared marks consistent with having been fired from the same gun. (Trial Tr. vol. 1, 168.) Investigators also found four .40 caliber Smith & Wesson bullets, all four sharing marks consistent with being shot from a second gun. (Trial Tr. vol. 1, 171.)

Danielle Johnson's mother, Deborah Johnson, testified that Petitioner and others came by her apartment a few hours before the murders. (Trial Tr. vol. 1, 32.) She testified that Petitioner had a gun in his hand, was looking for Ben Carter, and told her that Carter had pulled a gun on him earlier. (Trial Tr. vol. 1, 32.)

6

Keshae Isaac, the Commonwealth's key witness, testified that she saw Petitioner at Ben Carter's apartment shortly before the murders took place. (Trial Tr. vol. 1, 128.) She testified that while at Carter's apartment at around 8:00 p.m., Carter had two guns on his waist and was talking on the phone while Petitioner, Drummond, and Lofton were smoking marijuana with Isaac and Danielle Johnson. (Trial Tr. vol. 1, 128, 134-135.) Carter took the guns off his waist, placed them on the floor beside Danielle Johnson, and continued talking on the phone. (Trial Tr. vol. 1, 134-135.) Lofton then picked up the guns. (Trial Tr. vol. 1, 135.) As Isaac attempted to leave through the front door of the apartment, Petitioner grabbed her by the coat with one hand, while holding a gun in the other. (Trial Tr. vol. 1, 138.) She testified that Petitioner took Danielle Johnson into a bedroom, stating, "[B]e quiet, or I'm already two seconds off of you." (Trial Tr. vol. 1, 156.) Then, as Isaac was climbing out of a window to leave the apartment, Petitioner pushed her. (Trial Tr. vol. 1, 144.) Isaac testified that she left and did not hear any gunshots. (Trial Tr. vol. 1, 146.)

Detective Simmons testified that he interviewed Robinson on February 24, 2005, at the police station. The interview was recorded and the Commonwealth presented video of the interview during the trial. (Trial Tr. vol. 1, 104.) In the interview, Robinson admitted to going to Danielle Johnson's mother's house, but stated he carried a BB gun, and that he went to the Johnson house on Monday, not Wednesday, which was the day the murders occurred. (Tr. of Interview with Javon Robinson ("Robinson Interview") 12, Feb. 24, 2005.)[4] Robinson first told the detectives that he was at another part of town on the day of the murders. (Robinson Interview

---

[4] The interview transcript was admitted into evidence at trial as Commonwealth's Ex. 11. Although the original transcript does not contain page numbers, the Court has numbered the pages of the transcript for citation purposes.

7

15-16.) Petitioner later stated he visited Carter's apartment on the day of the crime and saw Drummond and Lofton there. (Robinson Interview 23-24.) Robinson indicated that he knocked on Ben Carter's door and Lofton answered. (Robinson Interview 27, 36.) Robinson stated that he stepped into the apartment, saw the guns on a table, and left. (Robinson Interview 28, 36.) Robinson also told the detectives that Lofton and Drummond allowed a second woman who had been with Danielle Johnson to leave when Robinson left. (Robinson Interview 33, 36.) Robinson stated that he heard gunshots, and shortly thereafter saw Lofton and Drummond run out of Carter's apartment. (Robinson Interview 29, 37.)

Finally, Crystal Kissel, an expert in DNA and serology analysis and typing, testified that a cigarette butt found behind a couch at the crime scene was consistent with Petitioner's DNA. (Trial Tr. vol. 1, 83; Trial Tr. vol. 2, 16, 21-23.) She testified that the likelihood that someone other than Petitioner contributed the DNA on the cigarette butt was one in six billion. (Trial Tr. vol. 2, 23.)

Robinson's defense at trial appeared to rest on a suggestion that he and Carter had made amends earlier in the day of the crime and that Lofton and Drummond had committed the murders. The defense called Keshae Isaac as a witness, who testified that Carter had been hanging out with the Petitioner earlier in the day as well. (Trial Tr. vol. 2, 56.) Travis Ellis, a long-time friend of Petitioner, testified that Ben Carter had come by to apologize to Petitioner "for any [earlier] mishaps . . . and invited [Petitioner and others] to his house to play the video game," but that Ellis did not go with Robinson to Carter's apartment. (Trial Tr. vol. 2, 62, 64-65.)

Troy Claiborne, who met Petitioner while in jail, testified that Lofton had described the entire event to him and never mentioned Robinson. (Trial Tr. vol. 2, 68, 73.) On cross-examination, Claiborne stated that Lofton never said that he and Drummond were not alone when committing the crime, and that Lofton never mentioned Isaac either. (Trial Tr. vol. 2, 74.)

The evidence at trial, although circumstantial, was ample and compelling. The DNA evidence on the cigarette butt corroborates Keshae Isaac's testimony that Petitioner was at Carter's apartment and smoking prior to the murder, although she testified to a different substance. Johnson's testimony placed a gun in Petitioner's hand on the day of the crime as he looked for Carter. Isaac's testimony that Robinson had a gun in his hand and threatened Johnson strongly implicates him. Travis Ellis and Isaac place the Petitioner at Carter's apartment on the day of the murders. Although his story evolved during the interview, Petitioner himself told police he walked into the apartment, saw a gun, left, then heard shots. Petitioner added that Drummond and Lofton ran toward and then came next to him after shots were fired. While he testified to some exculpatory facts, Claiborne testified that Lofton failed to mention Petitioner when admitting his role in the crime. The jury was convinced by the testimony and evidence presented, and found Petitioner guilty of the first degree murder of Ben Carter and second degree murder of Danielle Johnson.

2. **New Evidence**

"[A] gateway claim requires 'new reliable evidence–whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial.'" *House*, 547 U.S. at 537 (*quoting Schlup*, 513 U.S. at 324). This Court must consider whether the evidence Petitioner proffers amounts to reliable evidence which, had it been before

9

the jury, would "more likely than not [mean] that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 536-537 (*quoting Schlup*, 513 U.S. at 327). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324.

As an initial matter, Petitioner presents evidence that, although never before the jury, appears not to be new to the courts. At trial, defense counsel moved for a new trial based on the same after-discovered evidence before this Court. In the Circuit Court, the "after-discovered evidence" was the same signed and notarized statement from Drummond at issue here, which states:

> I swear that Javon Robinson had nothing to do with the murders of Ben Carter or Danell[sic] Johnson. I am signing this letter in a sound state of mind, and no one forced me to sign this hand written documentation. Also to correct the wrong that has been done.
> I pray that the courts take this letter into [evidence] to set Mr. Robinson free.

(Pet'r Br. Ex. D (capitalization corrected).) Drummond was unavailable to testify at trial, apparently because Drummond would have exercised his privilege under the Fifth Amendment[5] if put on the stand. (Trial Tr. vol. 2, 161-62.) Robinson claims this constitutes new evidence because Drummond would now testify, whereas he was still unavailable at the time of the motion for a new trial.[6]

Drummond's testimony does not constitute the type of reliable evidence necessary for an actual innocence claim. Even presuming reliability, although Drummond's affidavit exculpates

---

[5] "No person shall . . . be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

[6] Although Drummond may now be willing to testify, Petitioner continues to provide only the original affidavit that Drummond signed on September 6, 2005.

Robinson entirely, a jury on retrial would hear or have access to Drummond's multiple inconsistent statements. Drummond testified at Lofton's trial and implicated Robinson. During Petitioner's motion for a new trial, Petitioner's defense counsel summarized Drummond's testimony from Lofton's trial: "[Drummond] testified that Javon Robinson was not only a principal in the second degree but an actual active participant and principal in the first degree." (Trial Tr. vol. 3, 19, Sept. 28, 2005.) According to defense counsel, an earlier interview between the police and Drummond also implicated Robinson: "D.J. Drummond is interviewed by the police. He implicates Mr. Robinson as being a part of [the crime]." (Trial Tr. vol 3, 20.) If Drummond were to testify, the Commonwealth could use Drummond's prior statements to the police and testimony from Lofton's trial to impeach him.

No corroborating physical or scientific evidence to exculpate Petitioner exists, and Drummond's affidavit, when viewed in light of his other statements, holds minimal persuasive value. Drummond's affidavit remains, as indicated by the Virginia Court of Appeals, inconsistent with Isaac's testimony at trial. (Va. Ct. App. May 26, 2006 Order 4.) Based upon the Commonwealth's case at trial, which did not include any damaging statements from Drummond, the jury found the evidence compelling enough to convict Petitioner. Considering Drummond's testimony against evidence of his prior statements to the police and under oath, the evidence fails to show, more likely than not, that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. In fact, it seems possible that the evidence of Drummond's testimony from Lofton's trial, once introduced to impeach him, could further harm Petitioner's case.

11

Petitioner also presents here another affidavit previously before a court, but never before the jury. As he did in his second motion for a new trial, Petitioner offers an affidavit from David Clatterbough, who witnessed Drummond making statements to Robinson that "he blamed some things on [Robinson] in court because [Drummond] thought [Robinson] snitched on him."[7] (Pet'r Br. Ex. E.) Once again, even presuming reliability, Clatterbough's testimony that he overheard Drummond's statements to Petitioner, if admissible, does not rise to a level of evidence enabling the Court to find that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt. Drummond's statements still fall prey to their multiple inconsistencies. Moreover, Drummond's and Clatterbough's statements run counter to the testimony of other witnesses, including Isaac, Johnson, and Kissel. Therefore, Petitioner has failed to meet his burden of showing that, in light of the new evidence, it is more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt.

Petitioner also alleges cause and prejudice (Pet'r Resp. 2) (Docket No. 12), but states no circumstance that prevented him from filing on time.[8] Because Petitioner has made no showing of entitlement to equitable tolling, the Petition is time-barred.

---

[7] Clatterbough's affidavit was signed on October 19, 2005.

[8] "The existence of cause must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *Mikalajunas*, 186 F.3d at 493.

## **III. Conclusion**

Based on the foregoing reasons, the Respondent's Motion to Dismiss (Docket No. 4) will be GRANTED. The Petition will be will be DISMISSED.

An appropriate Order shall issue.

                                                                         /s/<br>
                                                     M. Hannah Lauck<br>
                                         United States Magistrate Judge

Richmond, Virginia<br>
Date: 8-6-09